316-0393 Steve Morrow and Eric Chambliss, et al. announced by Channing Hess, v. Pappas, admitted by Scott Swankert, and Shane Burrows, admitted by William Hopkins, and Kevin Stewart, in the First National Bank of Ottawa, admitted by Alan Green. May it please the Court. My name is Channing Blair-Hesse, and I represent the appellants in this matter. We are before you today to seek a reversal of the several rulings made by the trial court and a reversal of the summary judgment granted to appellees. The basis of the appellant's case is the tort of tortious interference with testamentary expectancy. And while there is a litany of legal issues I'm aware of in this appeal, I'd like to focus on just three of those issues. The first, the tort itself of interference with testamentary expectancy. Second, the first, the tort of interference with testamentary expectancy. To start off with and to get one issue out of the way right away, as to the first element of expectancy, the Supreme Court DeHart v. DeHart was very plain when it said the allegation that a prior will existed is sufficient allegation of an expectancy. That's exactly what we have here. The March 27, 2012 will was executed by the decedent Terrell Denman just a few months before she ended up taking a fall, breaking her hip in May, and then having a very swift decline in her health until her death in September of 2012. So that expectancy has been established by that March 27, 2012 will. And the confusion and much of the analysis of the tort of interference with testamentary expectancy is in the undue influence element. And it's often called undue influence. It's often the courts, DeHart v. DeHart, often rely on the will contest cases that involved allegations of undue influence. But the element is not just undue influence. It's any kind of tortious conduct that could be considered as fraud, duress, or undue influence. But oftentimes, in analyzing all the different cases, and there are several, DeHart v. DeHart being the Supreme Court case, the earlier Supreme Court case in the state of Hoover, which is a will contest case, Ghali v. Eastman in the first district, Anderson v. Kubitz in the first district, and Enray of State of Dawson in the third district here, another will contest case involving undue influence. In analyzing all these cases, I have found a pattern of facts that the courts look to to determine this element of undue influence or tortious conduct. And they are as follows. One, the relationship between the plaintiff and the testator. The courts often say, what was the relationship like? Was it familial? Was it close? How often had they seen each other? And here in our circumstances, we have a very close relationship. It's undisputed that Gerard and Durell were like family. Third party witnesses also said that she treated them like family. And what's even more telling is that in May, when she first comes to the hospital, in May, she lists Gerard Beach as her next of kin. She lists Eric Chambliss, one of the plaintiffs, as the person to contact. But those directions were never followed. So that's one of the elements, is the relationship between the testator and the plaintiffs. Second factor that I see in every one of these cases is what's the relationship between the defendants and the testator? And that relationship, they focus on whether there was a position of dominance or control by the defendants over the testator. And here we have a situation where Kevin Stewart, without the knowledge, without the consent of Durell Denman, became her power of attorney over her property, took over the management of her businesses. Then we have Rena Pappas, who also became the power of attorney over her healthcare. By the mere fact that the doctors in July 9th rendered her incompetent to make decisions on her behalf and invoked the Healthcare Surrogate Act. And under that Act, someone else had to make decisions on her behalf. And therefore, somehow, instead of her next of kin, instead of the person she listed as the person to contact, Rena Pappas, a cook in her restaurant, becomes her healthcare power of attorney. Then we have Shane. And Shane was also, like Eric and Steve Marle, one of her boys, very much a friend of Durell. So a very close relationship. That's the second factor that these courts look to. The third factor is a very strong factor because it's the health of the decedent. What was the health of the testator like when they were executing this will? That's in question. And here we have a situation where just in July, so August, September, less than three months before she executes the September will, she is rendered incompetent by her doctors. And it's not just her incompetence. She has been compared to a six-year-old in terms of her cognitive abilities on July 3rd. She's diagnosed with dementia with depression on July 4th. She's hallucinating, according to a witness who sees her in the hospital on July 4th. She's been invoked on July 9th. And she can no longer make decisions on her own behalf. She's diagnosed July 11th as a manic-depressive. She has respiratory distress. She has altered mental status on July 25th. She's anxious. She's feeling stressed. On August 25th, the doctor says she is close to death, has altered mental state, and is on 22 different medications. Yet nevertheless, in September, she executes a new will. What the courts have also found, and they specifically said, Anderson v. Kubitz says, that where the more enfeebled the mind is, the less evidence that must be presented to show undue influence. We have the most extreme enfeebled mind here in this case. Didn't her doctor testify that either the same day or the day before she executed the new will, that he had discussions with her and that she was actually, he rendered her competent to sign a do not risk DNR? That's Dr. Bailey. There's a couple issues to Dr. Bailey. First of all, Dr. Bailey saw her for five minutes. He also testified in his deposition that he saw her for five minutes, that because of her illness, that she could be with it one second and not with it the next second, that it could change any moment. But he felt that at the five minutes he saw her, that she was okay. Now, my point that I make in my briefs is, her signing that DNR was actually in violation of the Healthcare Surrogate Act. That act, which was invoked on July 9th, stated that this person, until they're rendered competent again by another doctor, cannot make decisions of life and death on their own behalf. That is why a surrogate has been appointed. And that was done on July 9th. That DNR signed by her was invalid. She couldn't sign it. Not under the Healthcare Surrogate Act. No doctor, no treating physician, saw her and rendered her competent after July 9th. So, not only was it illegal and in violation of the Healthcare Surrogate Act, but the time that she spent with her was five minutes. As opposed to the hours long that was spent by the doctors in July that rendered her incompetent. Hours long. Where they asked her to draw a clock and she couldn't even draw the hands on the clock. They said she had a cognitive ability of a six-year-old. She couldn't give her own personal history. It's these reasons why she was rendered incompetent. But the courts have said that it's important, two things. It's important because the amount of evidence, it's such a weighty element or factor that the courts consider, that they say you don't even have to, the less evidence you need on these other factors, if the mind is so enfeebled. And not only that, but what the Gauley v. Eastman court held, is that they found it important that the defendants knew about the condition of the testator. And that's what we have in this case. Despite denials in the depositions, they denied everything. Denied that there was any problem. Dorrell was strong. She was alert. She was fine. But when the records came down in the supplemental production, we find notes in Kevin Stewart's calendar that says, and I'm going to quote it, on July 27th, Stewart writes, Dorrell needs 18 hours of oxygen a day, mental state on top of that. Quote, doctors does not understand her, do not consider her competent. He knew in July that she was incompetent. He writes again on August 10th, Shane Burrows in Dorrell's will, protected, has Blue Lake, where is Dorrell's will? And then says, on September 11th, tells John Cantlin, her attorney, Dorrell's frail and wants Dorrell, directs him to get Dorrell's affairs in order ASAP. Then on the day that he actually takes the will down to get it executed, on September 13th, he writes in his notes, quote, any risk if I take it down? Dorrell, initial each page and witness sign. Dot, dot, dot. Do it in the morning. Dot, dot, dot. Undo influence. Dot, dot, dot. Doesn't take a lot to make a will. Dot, dot, dot. Risk. He knew. He knew that she was incompetent. He said it in his own notes in July. Rena clearly knew she was incompetent because she was the health care power of attorney. But the other, so if I go back to my five factors that I see in every one of these cases, relationship with the plaintiff, relationship with the defendant, the health of the decedent, number four is what are they doing to the decedent? Now they've got her under their control, what are they doing? Are they misleading her? Are they putting pressure on her? Are they avoiding people? Are people being avoided? Are her friends being kept away from her? That's exactly what happens in this case. Very similar to the facts of these other cases. In DeHart, the new wife keeps the old family away. Intercepts letters. Intercepts calls. Same thing in Eastman v. Ghali. Eastman, the farmhand, doesn't tell the testator that Ghali, the beneficiary of the will, had tried to visit. Same thing here. Rena Pappas admits to lying to my clients, Gerard and Becky, because quote, she was mad at them. She was mad at them because, well, I don't know why, but she lied to them and was just fine, was going to be home soon, and would not tell anybody where she was at. Kept her friends away. The affiant in one of the affidavits, Terry Cross, testified he couldn't even go see Gerard, because Rena Pappas told him, unless you have a power of attorney, you can't see her. She told employees at Gerard's businesses, tell anyone who calls Gerard doesn't want visitors. But that contradicts the evidence, because Kathy Noblock, a friend of Gerard's, does go visit her in early July, and says Gerard was lonely and depressed and wanted visitors. But this created a perfect storm. A perfect storm where Gerard doesn't give any visitors, and what's the inference? What's the inference that no one's coming to visit you? That no one cares about you. That the people that she had thought were her family, thought were her best friends, didn't care about her. So we've got a situation where not only is there the misleading statements that are made on the same day that they're trying to get her to change her will. Same day. So when the cases say that the misleading statements have to be made in conjunction with the execution or the procurement of the will, it's August. They have multiple meetings. And then at the end of August, after they've met, after Steward calls Katlyn and says, come, Darrell wants to change her will, what happens is when Katlyn gets there, Steward tells her, tells him what Darrell wants in her will. Steward tells her. Tells Mr. Katlyn. So we have all this happening all at the same time. In August. And an attack to influence her to take the plaintiffs out of their will and add an acquaintance, Rena Pappas, who was her cook in the restaurant. Besides this, we also have the attorney-client privilege and the patrol of doctrine. Both of which in this case has been used both as a sword and a shield. Both documents, doctrines were used to avoid turning over documents. 876 documents were filed under seal pursuant to the June order by the trial court and never released because he continued to deny our motion to compel, deny our motion to reconsider. And on September 2015, stood on this ruling that the attorney-client privilege did still exist. And based on this court's ruling in this case, it's the rationale behind it. And the rationale is that the decedent would want us to know how her intent was in her will. She would want to know. That's why the privilege is waived. That's why the privilege no longer exists. Similarly, in Petrillo, the attorney for Steward and the bank went to Darrell's doctor and the nurse and the staff and had significant conversations about her mental state on September 13th, the day of the will. Not incidental conversations. I'm sorry. Thank you. Now, Mr. Shreker. May it please the court. I'm Scott Shreker. I represent Defendant Rena Pappas. One thing that opposing counsel has been very artful about is avoiding the intentional aspect of this court. It is intentional interference of testamentary expectancy. And in order to do that, the plaintiffs have to establish the following distinct elements. The existence of an expectancy. Defendant's intentional interference with that expectancy. Conduct that is tortious in itself, such as fraud, duress, or undue influence. And a reasonable certainty that the expectancy would have been realized before that interference and damages. Now for the sake of argument, I don't have a problem with saying that they had an expectancy. I don't think that's an issue. What is an issue is defendant's intentional interference with that expectancy. In this case, there's been no evidence that Pappas knew of any of the prior wills. No evidence that Pappas knew plaintiffs were beneficiaries under a prior will. No evidence that Pappas knew that she was being made a beneficiary under the new will. And no evidence that Pappas acted in any way purposefully to remove the plaintiffs and add herself as a beneficiary to Ms. Denman's will. Let me ask you a question about this court. You're not contesting that the plaintiffs had an expectancy as a matter of law. I believe it's a necessary issue compared to what the other judges argued. Well, you get the parameters. I have argued to an extent in my briefs as to the expectancy issue. As a matter of law, it's an argument that could be made. The will was valid for all purposes based on the six month will contest period passing. So I think that is a legitimate argument to make. That as a matter of law, just the mere existence of a prior will creates an expectancy. There doesn't have to be knowledge on the part of the prior legacies or beneficiaries. I believe that there should be some knowledge that there was an expectancy. Otherwise, that could open up the door to a lot of other people making claims and essentially doing a money grab. Well, I'm going to ask the opposing counsel because it does seem to be the state of law to suggest that. And if that's the case, then this intentionality knowledge at the other end by the defendants, it seems kind of interesting that they have to know all of it. Right. Apparently the plaintiffs don't have to know all of it. But it's similar to the lines of an intentional interference with the business expectancy where in order to be liable under that sort of claim, you would have to know and interfere with someone else's business expectancy and know that that existed. So in the same lines here, I think knowledge as a requirement has a place. Now with respect to the intentional interference, the conduct must also be tortious rather than lenient. Counsel has relied on the undue influence aspect of that. And undue influence, which will invalidate a will, is any improper urgency of persuasion whereby the will of a person is overpowered and he is induced to do or forbear an act which he would not do if left sat freely. Must destroy the nature of the testator's freedom concerning the disposition of his or her estate and render that the will of another. Now in this case, and also, that influence must be directly connected with the execution of the will and must be present at the time it was made. In this case, none of the plaintiffs visited Ms. Stetman from this period of the beginning of June through her death in September of, September 25th, 2012. Counsel's attempts to make the argument that's because Pappas was preventing people, but acknowledges that there were visitors. And none of the plaintiffs in their testimony said that they were prevented by Pappas or anyone else from visiting. None of the plaintiffs had personal knowledge of Ms. Stetman's mental capacity during that time. None of the plaintiffs were present for the execution of the will, the meetings regarding the preparation of the will, or any of this medical treatment that Ms. Stetman was undergoing. They can't, they have no personal knowledge or information about undue influence by Pappas or anyone else. And they have no personal knowledge of really anything in the case. All this knowledge comes from plaintiff's counsel and a third party, Mary Beavers, whom also admitted that she had no knowledge of Pappas or anyone else placing Ms. Stetman under duress or undue influence. So there is a complete lack of any evidence regarding undue influence in this case, supported by any of the plaintiffs or anybody that was around during this entire time period. Ms. Mary Beavers also testified that she didn't see Ms. Stetman at any time after August 30th, 2012, which is two weeks prior to the execution of the will. And so she would have no personal knowledge regarding Ms. Stetman's mental state at the time. And that's important because Dr. Bailey testified that, you know, we agree that Ms. Stetman was sick. She had several health problems. She had COPD and she at one point had pneumonia, over-imposed COPD and Episema. She had bad lungs and when she didn't get enough oxygen to her brain, she had hypoxic episodes that led to some altered mental state. And this, most of what counsel has brought up about her mental state declining was during a two-week period at the end of June, early July, where she was suffering from this pneumonia that was superimposed over COPD. Now, she avoids talking about the treatment after the fact and her release back to the nursing home when she has returned essentially back to normal. She has episodes once in a while. But as long as she was getting oxygen, generally her mental state was perfectly normal. And that's what Dr. Bailey testified to. And Dr. Bailey did meet with Ms. Stetman on the morning of the will execution date of September 13, 2012, signed a DNR, recognized that she was competent and in his medical opinion determined that she was competent. So who does have personal knowledge of Ms. Stetman's mental state and whether she was under any undue influence at the time the will was executed? This September 13, 2012 will was the result of three separate meetings over the course of one month, none of which were attended or set up in any way by my client, Rita Pappas. First meeting was August 15 between Ms. Denman, Stewart, and Cantlin, where she announced that the March 27, 2012 will did not reflect her current wishes and wanted to change it. All of those individuals, except for the decedent, testified that she was competent and not under any undue influence at that time. The next meeting was August 29, and that was between Ms. Denman, Kevin Stewart, Jack Cantlin, and Joe Cantlin, three licensed attorneys in this state, respected attorneys. At that time, Durell directed specific changes to the will to remove these plaintiffs as beneficiaries and to add my client as a beneficiary under the will. Again, they all testified she was competent under any undue influence that day. Next meeting was on September 13. She had the DNR signed earlier that morning and judged competent by her doctor and steward as well as the will witnesses, observed her execute the will. He had the one witness, Vicki Gomez, who is an independent third-party witness from Texas, testified unequivocally that there was no undue influence and she was competent. Then he had Mark Seidel, who was approached by opposing counsel early on in the case to develop an affidavit stating that he was not present at the time that the will was on September 13, 2012. But the will was actually executed at Heartland Nursing Home, Heartland Medicare, and a place where he regularly visited his mother-in-law, and he admitted during his deposition that on that day he would have been taking several medications, two of which were for psychological issues that caused memory loss. And he admitted that that was his authentic signature on the will. Your Honor, this nearly 10,000-page record on appeal comprises of three years of discovery and litigation, over a dozen depositions, and several dozen court hearings. Yet plaintiffs have failed to show any material evidence to support their claim that Pappas knew of plaintiff's expectancy, engaged in tortious conduct, or purposely acted to interfere with their expectancy. And for that reason, I respectfully request that you affirm the decision of Honorable Judge Troy D. Cohen. May it please the Court, Ellen Green for the defendant, Apple Leafs, Kevin Stewart, and the First National Bank of Ottawa. I want to emphasize that there's only a single claim at issue, and as to these defendants and the other defendants, it's intentional interference with testamentary expectancy. The plaintiff had argued in her opening brief that the trial court error in dismissing conspiracy and fraud counts, that as we pointed out, those were in the second amended complaint. She amended her complaint and abandoned those claims. And as you listen to a plaintiff's counsel, she relies heavily on a conspiracy theory, an innuendo, but not on actual facts showing that any of these particular defendants did anything, and that rose to the level of undue influence, fraud, or fraudulent misrepresentation. As to Stewart and the bank, they argued that there's a rebuttable presumption of undue influence merely because there's a fiduciary relationship between Mr. Stewart and the bank as the trustee, or he's also an attorney, and the decedent, and that they received substantial benefit because they were paid a fee in administering her accounts and, or as acting as the executor of the state. Well, one, this isn't a benefit from the wealthy. These defendants were not named as beneficiaries. Also, there's no evidence in the record as to what their fees were or anything to suggest that they were anything but reasonable. And if this is all it takes to make a rebuttable presumption of undue influence, virtually every attorney who is acting in this capacity and receiving a fee would be subject to this rebuttable presumption of undue influence, and plaintiffs have offered no support to extend it this far. There's also no evidence that Stewart made any misrepresentations to Ms. Dedman. All he did, that's shown in the record, that he facilitated her desire to change the beneficiaries of her will by working with her other attorney, John Cantlin, who is a defendant who is not on this appeal, in getting her will executed because he was not available on the date that he needed to bring it to the hospital. There's no evidence of fraud. There's just the suggestion that she was talking, that Mr. Stewart was talking to Rena Pappas who was handling some of her business matters at her hotels, but he was in his capacity as a trust officer for the bank and some of these properties were in land trusts and he was assisting her in administering her business, so there's nothing nefarious about him acting in that capacity. Real quick, she brings up the Petrillo motion and said that there was significant conversations between defense counsel Bill Weir, a former judge, and he has since retired so he is no longer involved in the Petrillo case. Bill Weir spoke with an office assistant to set up the deposition and he was told by the assistant that the only time that Dr. Bailey saw the decedent was on the day that he witnessed her sign the DNR. There were no counter-affidavits submitted and the Petrillo doctrine, that only applies when the doctor is the plaintiff's physician. Dr. Bailey did not treat any of the plaintiffs and none of their medical records are at issue here, so the trial court did not deny his, abuse his discretion in denying the motion. On the attorney-client privilege, she also stated that the motion to reconsider, the motion to compel had been denied. I couldn't find it on the record. She didn't put that in the brief. Also in the reply, she brings up a case from May 2016, which is about a year after the ruling had been made for the first time in the reply brief that dealt with some kind of trust, but there's nothing, and I refer you to the brief because it's kind of a procedural mess, but she's asking for an exception to the attorney-client without really applying it to any documents or testimony. It's just sort of in a vacuum and it's not really an issue that this court needs to address at this time. We would also ask the court to affirm the grand summary judgment in favor of defendant Stewart and First National Bank. Thank you. May it please the court, I think that my co-counsel have more than adequately addressed all of the various issues before the court, and many of the issues raised in the briefs actually don't apply to my client. So honestly, the only reason that I'm up here is if there are still any lingering questions that any of you have with regards to issues applicable to Shane Burroughs, the defendant that I represent, then I will gladly answer those questions. However, if there are no questions, then I will simply ask that you affirm the decision of the lower court. Thank you. Thank you. I'd just like to address some of the issues raised in the attorney's presentation. First of all, the case law has stated that the mental state of the decedent is relevant for two years prior to the execution of the will and even after the will. So this finite laser focus on just September 13th is contrary to the law. Often in each one of these cases, they talk about the decedent's mental and physical health years prior and even after the execution of the will. So the five minutes that Dr. Bailey saw Jarrell simply is a minute point. And what's most important is that there are contradictions in the evidence that are all over the evidence. From Rena saying that she didn't know anything about the will, we have testimony from a third party saying she called her, Barry Beavers, and said, can Jarrell sign the new will? This is August 25th when she was about to be helicoptered to a new hospital. She said, Jack and Kevin are on their way. Can she initial it? So how can she deny even knowing about this new will if she's calling Barry Beavers asking her if Jarrell can sign it? There's notes by Kevin Stewart saying, noting different dates where he's having meetings with Rena Pappas about the will. This is all in August. Did anyone testify in those depositions that that was the content of the conversation when they met? These notes I know are about this client, but are they necessarily about them talking about this will? There was a question about finding her will, which is completely, and finding that something exists doesn't jump to knowledge of contents of that thing that exists. Certainly. So we have a complete denial in the depositions that there was any conversation. But then we get, after the depositions, this documentation from Stewart. And Stewart writes on August 10th, Shane Burroughs, in Jarrell's will, protected, has Blue Lake, that's one of Jarrell's properties, also states where is Jarrell's will. Then he has a private, then he has a meeting with Stewart, I'm sorry, Stewart has a meeting with Rena Pappas and says, I apologize, I'll just get it one second here. And I'm not finding it directly, but I will find it, but he has in his notes, and it's in my brief as well, that he has a meeting where he specifically says, meeting with Rena, balance of will, that's the notes. So balance of will with Rena in the office in some meeting. Then he has text messages where Rena asks, did you get your business done Thursday? Well, Thursday was September 13th, the day that he went down and signed the will. So we have these pieces of evidence, along with Mary Beavers, who testified that Rena wants to stop the helicopter, stop Jarrell from leaving, so that she can get this new will initialed. And then the next day, because she had actually revoked the DNR, so the doctor calls Rena Pappas, because Rena Pappas is her healthcare power of attorney, and says, I recommend, she's close to death is the record. So them saying that she was not good in July, but fine in August is ridiculous, because in August 25th, the notes say she's close to death. But that doesn't mean that her mental capacity was, like you say, close to death and still be lucid. Certainly, but there's nobody that's ever rendered her competent after July 9th. Dr. Bailey does. He says that she was competent to sign that DNR, which I know you say that violates the healthcare power of attorney act, but he renders her competent. He says she can sign a DNR. So he sees her for five minutes and says, she can sign a DNR. Whether she has testamentary capacity, whether she's competent, there's a conflict in the evidence. And I think that's where we get to, right? Tortious interference, and any time there's a conflict of evidence, first of all, it goes to the jury. And then we have the inferences from all these meetings that are being had in August about the misleading statements about my clients, trashing her property, and then saying, well, you better, Stewart has the meeting and says you better take them out of your will. So there's all this influence in August, all happening at the same time, to get her to take them out of the will. There's inferences to be made by the fact that she's keeping people away, she's not letting her friends come and see her, she's lying about her state of mind, and saying she's fine, her physical and mental state. And what the courts have said is that this can be wholly circumstantial, but where there's contradictions in the evidence, which we clearly have on multiple issues, the mental state, the physical state, the misleading statements. So we have this in an NRA estate of CCLQX, the first sister case in 93, where both parties submitted evidence, very similar actually to this case, where you have evidence of the witnesses saying she was fine, real witnesses, and then evidence from the doctor saying she's not fine. And those actually, the witnesses, the affidavits from the medical providers were actually days before the will was signed. And the court says, you've got to give it to the jury. It's particularly inappropriate to draw the inferences as the judge. It must be given to the jury. And that's why we're asking this court to reverse the trial court's grant of summary judgment and bring this back to the trial court for a jury. Thank you.